THE BANK OF TENNESSEE *v.* JOHN MCKEAGE.
THE SAME *v.* THE SAME.
THE PLANTERS BANK OF TENNESSEE *v.* THE SAME.

Where one person furnishes the funds to purchase an article, and another his credit, skill, and industry in preparing it for sale, in order that a profit may be made for their mutual benefit, it will constitute a partnership.

Whoever shares in the profits of a partnership is a partner, and as such responsible for its debts, though his name be not in the firm.

Partnership property is liable to the creditors of the partnership in preference to those of the individual partner.   C. C. 2794.

The share of a member of a partnership may be seized and sold to satisfy his individual creditors, subject to the debts of the partnership; and such seizure, if legal, operates a dissolution of the partnership.   C. C. 2794.   But a creditor of one partner cannot seize under execution, or attach any particular thing or piece of property belonging to the partnership, nor any portion of it, to satisfy his debt.   The whole share or interest of the indebted partner in the partnership must be seized or attached, when the partnership will be dissolved, and the creditor entitled to satisfaction out of the share of his debtor, after payment of the partnership debts.   The interest of a partner is a distinct thing, and must be taken as a whole.

APPEAL from the Commercial Court of New Orleans, *Watts*, J. *Peyton* and *I. W. Smith*, for the appellants.

*C. M. Jones*, for the defendant and intervenors.

GARLAND, J.   These suits were instituted against McKeage, as the endorser of three bills of exchange and a promissory note, with a demand for interest and damages.   Two hundred and six hogsheads of tobacco, called *strips*, were attached as the property of the defendant, he being a non-resident.   The intervenors, who are merchants in Richmond, Virginia, claim the property as belonging to them, and the principal questions before us arise out of this claim.

The first suit is on two bills of exchange, drawn by Galbraith, Cromwell & Co., at Clarksville, Tennessee, on Galbraith, Logan & Co., New Orleans, endorsed by McKeage, amounting to $11,000.   The second is on a bill drawn by and on the same parties, for $7,500; and the third is on a promissory note, drawn by R. W. Galbraith and Thompson Greenfield, also endorsed by the defendant; all of which bills, and the note, have been protested for non-payment.

Bank of Tennessee v. McKeage.   Planters' Bank of Tennessee v. McKeage.

The facts of the case, as we have been able to extract them from a record of nearly 800 pages (three-fourths of which is made up of irrelevant matter), are, that the drawers of the bills and note were merchants in Tennessee, and, to raise money, obtained the endorsement of the defendant on their paper, which was discounted by the banks now suing on it.   No question has been raised in the argument as to the liability of Mc-Keage on his endorsements.   A judgment was first rendered in favor of the plaintiffs and against the intervenors; but a new trial was granted, and, on a second trial and further evidence, a non suit was entered against the plaintiffs, on the ground that the tobacco attached belonged to the intervenors, and consequently the defendant was not legally before the court, never having appeared personally or by an authorized attorney.   The defendant has for a number of years been established at Clarksville, where he has an extensive tobacco *stemmery*, a residence, and a number of slaves engaged in carrying on his business, which is the purchasing of tobacco in that section of the country, stemming, or making strips of such as is suitable for that purpose, and selling again in the leaf such as is not fit for that purpose.   The intervenors are large purchasers and shippers of tobacco and cotton, transacting their business in Tennessee through the defendant, and the Messrs. Atkinson, and in New Orleans through other agents.   For sometime previous to 1838, they remitted money to the defendant, to purchase tobacco for them, which he stemmed and put into hogsheads, and sent to New Orleans, to their agents, for which he was paid a certain compensation, having no interest in the property or speculations at all.   In that year the intervenors proposed to the defendant to proceed as theretofore, but he declined doing so, alleging as a reason, the difficulty of keeping the interests and affairs of the intervenors separate from his own; he being engaged in purchasing, stemming, and selling tobacco on his own account.   It was then agreed between them, that Kerr, Caskie & Co. should furnish the defendant with what amount of funds he should want, and he was to buy tobacco, stem it, and prepare it for market, and the parties were to share the profits and losses. At the end of every year an account was to be made up of their transactions, and the profits divided.   The letter of the in-

tervenors to the defendant, of October 18th, 1830, after speaking
of the probable extent of the crop, the prices, and the probability
of profits, proceeds : "We observe that you decline to put up
the 150 hogsheads for us, which we proposed, but we are quite
willing that you should take an interest in all that you stem,
provided you consent to send round here (meaning to Richmond)
the first 150 hogsheads, and allow us to send this lot to Bristol.
It is necessary for us, to make up an assorted cargo for that mar-
ket, and as there is every probability that as good, if not better
prices, will be obtained there, than at Liverpool, we suppose you
will feel no objection to this course.   Should such an arrange-
ment be agreeable to you, we are willing that you should put
up, on joint account, such quantity as circumstances may render
advisable, and you can do conveniently to good advantage ;
and you can take either a third or a half interest, as you choose,
though, as the cost this year will be high, and the probable pro-
fit small, we think it likely that one third will be as much as
you will care about risking."   To this proposition McKeage as-
sented, taking one half interest ; and the parties acted on it
up to the time of the seizure in this case.   The intervenors fur-
nished the funds to purchase tobacco, some years amounting to
seventy-five or eighty thousand dollars.   The funds were put
into the hands of McKeage, by his drawing bills and drafts on
the intervenors, and having them discounted by the banks in
Tennessee, or by individuals, or by their sending him bills and
checks drawn on other places, which he disposed of in Tennes-
see.   A large number of those bills and drafts are in the record ;
others are not produced, as the drawers are supposed to have
them ; but regular accounts current are produced, showing the
funds furnished.   They show that the intervenors charged the
defendant with the money furnished to him, and when the tobacco
was sold and account of sales rendered, they credited him with
the proceeds, and the profits were divided.

Roche, a witness for the plaintiffs, says that "McKeage has
been, ever since he resided in Clarksville, engaged in stemming
tobacco, and that, for a short time during the year 1839, he was
a partner of Galbraith, Williams & Co., dry-goods, forwarding,
and commission merchants, which firm sold out to Galbraith,
Cromwell & Co. and Galbraith, Logan & Co. I never doubted Mc-

Keage's ownership of the tobacco, as he had uniformly bought tobacco in his own name, shipped it in his own name, insured it in his own name, drew bills and notes in his owm name, and endorsed in his own name; and he never made it public that he was doing business for another person." Wisdom, who as well as Roche, is an officer in the bank, says "McKeage was looked to, and relied on as a responsible endorser, and good for the amount of the bills.    He was an extensive tobacco dealer, and had a large quantity of property in his possession, and was considered a good, responsible man; which property was believed to be his own.    He transacted business in his own name, was engaged in buying and stemming tobacco, and shipping it.    His transactions were in Clarksville and the surrounding country, among the planters.    His credit was never questioned, and might be considered unlimited."    Beaumont says, he is intimately acquainted with McKeage.    His credit and standing was of thè first order.    At the time "he transacted business in his own name, purchasing, stemming, and shipping tobacco. His purchases were made in Clarksville and the surrounding country, and to a large amount, say, from fifty to sixty thousand dollars, or more, per annum.    His credit was unbounded.    He has resided in Clarksville since 1831 or 1832.    He owns his residence, the tobacco-stemmery buildings, the ground attached to each, some twenty negroes, besides personal property.    In addition to stemming tobacco, he was for a time engaged in merchandising.    The firm was Galbraith, Williams & Co.    He bought the tobacco here, in his own name.    It was marked in his own name, and by him shipped.    Some years ago McKeage informed me, that he had found it very difficult to keep the business of Kerr, Caskie & Co., and his individual business, separate, and that, therefore, he had determined to do no further business for them, unless the whole should be on joint account with them.    He subsequently informed me that Kerr, Caskie & Co. had agreed to the same, and that they had an interest in all the business he did; and I have heard nothing to the contrary, until these suits were commenced."

Crouch says, he was an agent for McKeage.    He purchased tobacco for him, and marked the hogsheads J. McK.    Other

witnesses swear to similar statements as Roche, Wisdom, and Beaumont. Some knew, or had heard, of the connection between the defendant and the intervenors in business ; others had not such information. The statements of these witnesses embody the leading facts as to McKeage's proceedings in Tennessee. His credit was much relied on when the bills and notes were discounted. One witness says, but for his name, the bills would not have passed the exchange committee of the bank.

In 1836, the house of A.L.Addison & Co. was established in New Orleans, and they were immediately constituted the confidential agents and correspondents of the intervenors, and McKeage was directed by them to consign to that firm all the tobacco which belonged to them, or in which they had an interest, which he did ; and we find him always afterwards in constant correspondence with those agents, consigning tobacco strips, and tobacco in the leaf, and stems, for the intervenors.

A. L. Addison, a member of the New Orleans firm, had been a member of the firm of Kerr, Caskie & Co., and understood their arrangement with McKeage, and the connection between them. He testifies, as does McMurdo, another partner, that since the early part of the year 1837, to the commencement of these suits, the defendant has been shipping tobacco to A. L. Addison & Co., on account of Kerr, Caskie & Co. The witnesses say, they obeyed the orders of the intervenors in selling or disposing of the tobacco sent by McKeage. When tobacco was sold, the account of sales were made out in the name of and rendered to the intervenors. They always paid the costs and charges when tobacco was shipped to other ports, and it was always in their name. Sometimes the defendant sent tobacco on his own account, and then accounts of sales were rendered to him ; but when he did send on his own account, he generally wrote to that effect. Of the tobacco attached nearly all was to be sent to England, on account of the intervenors. The agents, correspondents, or a partner of the intervenors, in England, sent their accounts to the house in Richmond, where McKeage's account was credited and settled. The tobacco attached was received on account of the intervenors.

In relation to the tobacco attached and in contest, it appears that on the 16th of April, 1842, McKeage wrote to Addison & Co., from Clarksville, saying that, on that day he had shipped 135 hogsheads of strips, and 12 hogsheads of leaf tobacco to them. That on the 4th of the same month he had written them directing an open policy to be taken, to cover 500 hogsheads of strips and 175 hogsheads of leaf tobacco. He says : " You will please take the insurance in the name of Kerr, Caskie & Co., and hold the strips subject to their order. The leaf you will sell to the best advantage, and place proceeds to their credit." A portion of the tobacco so shipped is in contest. A policy was taken out in the name of the intervenors, as directed, for $87,500, to cover the shipments. On the 6th of May, 1842, the defendant made another shipment of 88 hogsheads of strips. His letter, informing Addison & Co of it, only states that so many hogsheads have been shipped by the steamer West Tennessee, requesting that they be stored in a dry warehouse, and that the leaf tobacco may be sold. The bills of lading state that both shipments had been made by McKeage, and consigned to Addison & Co. The hogsheads had the defendant's usual marks, and, on the 13th of May, 206 hogsheads, out of the two shipments, were seized. A great many other hogsheads were subsequently shipped, but none seized. As soon as the intervenors were informed of the attachment, they wrote to their agents, and their letter is admitted in evidence, without objection, in which they claim the tobacco, and say : " By our agreement with Mr. McKeage, we are to furnish all the funds necessary to purchase the tobacco and to put up the strips, and are to have the entire control over the whole, directing the shipments and controlling the proceeds. The profit or loss upon the operation to be equally divided between us." The defendant, in a letter also admitted without objection, says the same thing.

McMurdo says, that all the tobacco received from the 16th of April to the 15th of July, 1842, from McKeage, was for account of the intervenors. A part of it was seized in the warehouse, and a part on the levée ; but the evidence satisfies us that the bills of lading had been received by Addison & Co. before the attachment was levied.

The greatest difficulty we have had in this case is to condense and state all the material facts of it.   In our opinion they establish one of two positions, either of which is fatal to the plaintiffs.   They prove an absolute ownership in the intervenors, or a partnership, for the purpose of buying, manufacturing, and selling tobacco, for the mutual profit of the parties.   If the tobacco belonged absolutely to the intervenors, it is an end of the question ; but we are of opinion that it belonged to them and the defendant, as partners.   The intervenors furnished the funds to purchase tobacco, and the defendant his property, credit, skill, and industry, in preparing it for sale, so that profit might be made for their mutual benefit.   This is a species of partnership well known to our laws, and those of every commercial country. Civil Code, arts. 2780, 2781.   It is not necessary to, nor of the essence of, a commercial partnership, that it should contain the name of each partner (11 Mart. 331); and he who shares in the profits of a partnership is responsible for its debts, although his name be not in the firm.   5 La. 409.  7 Ib. 435.   Silent partners are recognised by our law, and their rights and responsibilities protected and defined.   6 Mart. N. S. 49.   Our Code, article 2794, says, that the partnership property is liable to the creditors of the partnership in preference to those of the individual partner, but the share of any partner may, in due course of law, be seized and sold, to satisfy his individual creditors, subject to the debts of the partnership, and such seizure operates a dissolution of the firm.   11 La. 262.   The creditors of a firm are entitled to be paid by preference out of the partnership effects, over the creditors of an individual partner.   12 La. 370.   From these well established principles, it results, that the interest of a partner in a particular thing, or piece of property belonging to the firm, cannot be seized or attached for his individual debt. An individual creditor cannot, under an execution, or attachment, have the half or third of a piece of goods, or other article belonging to a partnership, seized.   He must have the whole share or interest of the indebted partner seized, and thus dissolve the partnership, and take the share, after payment of the partnership debts.   There is a community of interest in the property as well as in the profits, and neither is separately liable

JUNE, 1845.                137

Bank of Tennessee v. McKeage.   Planters' Bank of Tennessee v. McKeage.

to seizure.   The interest of a partner in the firm is a distinct thing, and must be taken as a whole.

In the argument of this case it was attempted to be shown, that the bills and note sued on were discounted for the use and benefit of McKeage, and the money probably used in purchasing the tobacco seized, or some other bought for the benefit of the defendant and intervenors, and were, therefore, partnership debts.   In this, we think, the plaintiffs have failed.   The note on which the Planters' Bank has sued, says, on its face, that it is for the benefit of the drawers ; and the testimony in the case satisfies us, that the proceeds of the bills, or drafts, went to the credit of Galbraith, Cromwell & Co., the drawers.   If the proceeds had gone to the credit of McKeage, it would have been very easy for the plaintiffs to prove it.   They discounted the bills, and knew perfectly well who received the proceeds.   The cashier of each bank was examined, and some of the clerks; and none of them pretend that the defendant received the money.

The counsel for the plaintiffs zealously urged that, in consequence of the manner in which McKeage transacted his business in Tennessee, and the fact of all the tobacco being purchased, marked, and shipped, in his own name, it therefore belonged to him.   These facts are unquestionably strong presumptions of the property being his, but like all other presumptions, they must yield to evidence which destroys them.   It was well known to different persons, that a connection, in the tobacco business, did exist between the defendant and the intervenors. Other persons say that they did not know it ; but that it was a matter of notoriety that McKeage was in the habit of drawing bills and drafts on the intervenors, for large amounts, and that they frequently sent him checks and bills, all of which were sold at a premium, or discounted, and money raised to purchase tobacco.   No doubt, many of those bills and checks passed through these two banks.   These remittances, amounting to from sixty to eighty thousand dollars annually, were continued year after year, were well known, and it is proved that the defendant's credit was unbounded, in consequence of his relations in business with the intervenors.   He purchased tobacco large-

ly, with the funds so received; and yet the witnesses say that they never heard, or suspected otherwise, than that the defendant was making all those purchases on his own account. The counsel tell us that these were advances made by the intervenors, not to be invested for their own benefit, or the mutual benefit of both, but solely for the profit of McKeage. If it were so, it would prove the intervenors to be very disinterested persons. We are not so credulous as to believe that they did, for a series of years, annually advance thousands of dollars to McKeage, without any benefit to themselves. The evidence satisfies us that a partnership, not of an unusual character, existed between the parties, and that the property attached belonged to them in that capacity.

We are of opinion that the court did not err, in refusing the application of the plaintiffs for a new trial, on the ground of other evidence having been discovered. The alleged evidence is a trust deed, made by McKeage, for the benefit of the intervenors, to secure them, in case this suit and another in Richmond, should be decided against them. This deed, so far from proving that the intervenors are responsible personally to the plaintiffs, or their property liable to attachment, goes to prove that McKeage did not consider or hold them answerable, and has endeavored to secure them from loss, in case it should turn out, that his friends and partners had become involved for his personal engagements, in consequence of his management of their mutual interests. The decision of this case in favor of the intervenors, releases the property in Tennessee of the lien on it, and gives the plaintiffs an opportunity of seizing it, when they shall obtain a right to do so, by judgment or otherwise.

*Judgment affirmed.*